## Alexandria

## MARK ALLEN PUGLIESE

v.

## COMMONWEALTH OF VIRGINIA

No. 0918-91-4

Decided March 9, 1993

COUNSEL

J. Michael Solak, (Kevin A. Bell; Hall, Monahan, Engle, Mahan & Mitchell, on brief), for appellant.

Eugene Murphy, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**COLEMAN, J.**—Mark Allen Pugliese was convicted by a jury of murder as a principal in the second degree and robbery. For the reasons that follow, we affirm the convictions.

On May 19, 1990, Arthur P. Beckmann, Jr. left his home in Philadelphia, Pennsylvania to go to Louisville, Kentucky. On his way, he picked up a hitchhiker, Eugene Davis. The two were later seen at a Winchester, Virginia bank where Beckmann took a twelve hundred dollar cash advance on his credit card. On the evening of May 21, Beckmann went with Davis to the Winchester apartment of Davis' friend, David Ebert. Mark Allen Pugliese also was at Ebert's apartment. The four men partied together. In the early morning hours of May 22, the four men left Ebert's apartment in Beckmann's van, ostensibly in search of a late night bar. Beckmann drove. Ebert was in the front passenger's seat, and Pugliese and Davis sat in the back.

Later that day, the van was found burning in a secluded area of Winchester. The State Police discovered Arthur Beckmann's body in a ditch along Route 50 in Clarke County. The body had four gunshot wounds to the head. Money, credit cards and jewelry were still on Beckmann. His wallet contained a card with the names of Pugliese and Pugliese's mother on it. The police also found the victim's hat with one bullet hole in it approximately one mile from where the body was found.

Shortly after the crimes, Pugliese was seen with between four to six hundred dollars in his possession. On May 23, Pugliese went to Brenda Hall's home and asked her where he could buy drugs. He told her that he had approximately one thousand dollars to spend. Brenda Hall purchased drugs for Pugliese three times that day. He gave her a total of three hundred dollars. Pugliese also was known to have maintained contact with Eugene Davis for several months after Beckmann's murder. They were seen socializing together on several occasions.

The police arrested Pugliese for Beckmann's murder on September 10, 1990. After the police read him his *Miranda* rights, Pugliese asserted his right to remain silent and contends he requested counsel. The two arresting officers, Officer Gregg and Officer Shevokas, did not recall Pugliese asking for counsel. Nevertheless, a couple of hours later, Pugliese waived his right to remain silent by so indicating on a printed *Miranda* waiver form. Thereafter, he gave a recorded statement disclosing the events leading up to Beckmann's murder. In his statement, Pugliese repeated several times that he was telling the truth and was willing to take a lie detector test.

In his statement, Pugliese admitted that he was in Beckmann's van when Eugene Davis shot the victim. He stated that they had left Ebert's apartment to look for a bar. By the time they left the apartment, Pugliese said he was quite intoxicated. Before leaving the apartment, Davis had mentioned to Pugliese that he intended to ''hustle'' Beckmann. Pugliese explained that by ''hustle,'' he understood Davis to mean cheat him out of money. He did not expect Davis to use a weapon to get money. As they were riding in the van, Davis told Pugliese that he was going to shoot Beckmann. Pugliese claimed, however, that he did not take Davis seriously. Davis then shot Beckmann, who was driving the van, once in the back of the head. Pugliese and Ebert gained control of the van and brought it to a stop. Davis asked Pugliese and Ebert to help him remove Beckmann from the van. Davis dragged Beckmann from the van into a ditch, while Pugliese and Ebert waited in the van. Beckmann was not dead from the first shot, so Davis shot him three more times in the head. According to Pugliese, Ebert was upset with what Davis had done and began to yell profanities at Davis. In response, Davis threatened Ebert with his gun. The three men drove Beckmann's van back to Ebert's apartment, where all three unloaded the van. They took approximately twelve hundred dollars in cash, of which Pugliese said he received two hundred dollars.

Pugliese then drove the van, with the other two men accompanying him, to a secluded area where the three doused it with gasoline, and each of them threw matches to set it afire.

## I. CONFESSION - WAIVER OF RIGHT TO COUNSEL

■ We hold that the trial judge did not err in ruling that Pugliese voluntarily and knowingly waived his Fifth Amendment rights to remain silent and to have counsel present during a custodial interrogation. An accused in custody may waive his fifth amendment rights, but the Commonwealth must prove by a preponderance of the evidence that the waiver was made voluntarily, knowingly and intelligently. *Goodwin v. Commonwealth*, 3 Va. App. 249, 252, 349 S.E.2d 161, 163 (1986) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).

■ If, while in custody, a person invokes the right to have counsel present, the police may not resume interrogation until counsel has been made available or until the individual re-initiates communications and waives his or her right to counsel. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). If a confession is obtained in violation of *Edwards*, it is presumed to have been the result of an involuntary waiver of Fifth Amendment rights and, therefore, any evidence obtained as a result thereof is inadmissible. *Id.* at 487. Whether an individual requested counsel is a factual determination, and that finding will not be disturbed on appeal unless clearly erroneous. *Mills v. Commonwealth*, 14 Va. App. 459, 468, 418 S.E.2d 718, 723 (1992) (citing *Fisher v. Nix*, 920 F.2d 549, 552 (8th Cir. 1990), and *United States v. Hagan*, 913 F.2d 1278, 1282 (7th Cir. 1990)). In this case, the trial judge, after hearing conflicting testimony from Pugliese and Officers Shevokas and Gregg, found that Pugliese did not request counsel while in custody. While the two officers testified that they had no recollection of Pugliese requesting counsel, that is an event which police officers would be expected to observe and remember if it had occurred. *See Norfolk & W. Ry. v. Greenfield*, 219 Va. 122, 130-31, 244 S.E.2d 781, 785 (1978). As a fact finder, the trial judge was entitled to believe and accept this testimony. Viewing the evidence in the light most favorable to the Commonwealth, the testimony of the two officers supports the trial judge's finding that Pugliese did not request counsel. Accordingly, the *Edwards* rule does not apply.

■ Police officers may not resume interrogation of a person in custody who has asserted his right to remain silent unless they have "scrupulously honored" that right. *Michigan v. Mosley*, 423 U.S. 96,

102-04 (1975). A statement procured in violation of *Mosley* is presumed to have been obtained by an involuntary waiver of Fifth Amendment rights and, therefore, it is inadmissible. *Id.* at 99-101. Whether a person's decision to remain silent has been "scrupulously honored" requires an independent examination of the circumstances. *Id.* at 104-05. In making this determination, an appeals court is "bound by the trial court's subsidiary factual findings unless those findings are plainly wrong." *Wilson v. Commonwealth*, 13 Va. App. 549, 551, 413 S.E.2d 655, 656 (1992).

After hearing conflicting testimony, the trial judge found that Pugliese re-initiated the discussion with the police after first asserting his right to remain silent and that he thereafter made a voluntary and knowing waiver of that right. The evidence to support that finding was that Pugliese marked out on the *Miranda* form his earlier designation that he chose to remain silent and affirmatively specified that he waived his right to remain silent. Also, Officers Gregg and Shevokas testified that they did not ask Pugliese any questions after he first invoked his right to remain silent, and that, thereafter, Pugliese, who had just appeared before the magistrate, initiated the discussion and changed his waiver designation. The police officers advised Pugliese of his Fifth Amendment rights three times over the course of two hours, and they did not resume interrogation until Pugliese requested that they do so.

█ Furthermore, Pugliese's confession was not obtained by a promise of leniency. A confession by an accused may be involuntary if it is obtained by a promise of leniency. *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (per curiam). A "promise" has been defined as "an offer to perform or withhold some future action within the control of the promisor." *United States v. Fraction*, 795 F.2d 12, 15 (3d Cir. 1986); *see also Hawkins v. Lynaugh*, 844 F.2d 1132, 1139 (5th Cir.), *cert. denied*, 488 U.S. 900 (1988). A "promise" does not, however, include "a prediction about future events beyond the parties' control or regarded as inevitable." *Id.*

Officer Gregg told Pugliese that the Commonwealth's attorney would most likely believe a statement made by the first person to come forward who had been involved in the event. Officer Gregg's statement promised nothing. At most, it was a suggestion that the Commonwealth's attorney might look favorably upon the first person to cooperate. The officer made no promise and merely speculated about decisions that would be made by the Commonwealth's attorney, decisions beyond Officer Gregg's power to control. *See Lynaugh*, 844

F.2d at 1139 (police officer's statement that he believed that the court would be lenient toward a defendant who confessed was not a "promise of leniency"). Officer Gregg did not obtain Pugliese's statement by a promise of leniency that would render the statement involuntary and inadmissible.

## II. REFERENCES TO LIE DETECTOR TEST

▮ Generally, it is "improper to admit evidence that an accused had been willing or unwilling to take a lie detector test." *Barber v. Commonwealth*, 206 Va. 241, 250, 142 S.E.2d 484, 491 (1965). Nevertheless, admission of such evidence is not reversible error unless it is prejudicial. *Id.* Generally, an error is "presumed to be prejudicial 'unless it plainly appears that it could not have affected the result.' " *Lavinder v. Commonwealth*, 12 Va. App. 1003, 1008, 407 S.E.2d 910, 912 (1991) (en banc) (quoting *Caldwell v. Commonwealth*, 221 Va. 291, 296, 269 S.E.2d 811, 814 (1980)). In order to determine whether Pugliese's mention of his willingness to take a lie detector test prejudiced his case, we must consider several factors, such as the nature of the error and how it may have improperly influenced the fact finder, the circumstances attending disclosure, the strength of other evidence of the defendant's guilt, and whether any action taken by the trial judge may have cured the error. *Barber*, 206 Va. at 250, 142 S.E.2d at 491.

The trial court's decision to admit the entire unedited recorded conversation, including Pugliese's statement that he was willing to take a lie detector test, does not constitute prejudicial error. First, Pugliese's references to the lie detector test were voluntary, spontaneous and extraneous to the subject of interrogation. The police officer recording the confession did not induce Pugliese to request a lie detector test and did not attempt to obtain those requests for the purpose of developing evidence against Pugliese. *See id.* at 251, 142 S.E.2d at 492 (witness' extraneous testimony that defendant refused to take a lie detector test was not prejudicial where the Commonwealth's attorney did not intend or attempt to use the defendant's unwillingness to take a test as evidence of guilt). Also, the comment was initiated by Pugliese and showed his willingness to take a lie detector test, rather than his refusal or hesitation to submit to a test that arguably might suggest to a lay jury that he was not being candid. His request did not harm him, it favored him. It was exculpatory, not inculpatory.

■ Furthermore, it would not have been feasible for the trial court to have altered the recording and edited those references from it. The references to the lie detector were interspersed throughout the recording and could not have been redacted without sacrificing the continuity of the conversation and the tone of Pugliese's voice, which were relevant factors to the jury's determination whether Pugliese's statement was voluntary. *See Williams v. Commonwealth*, 11 Va. App. 149, 152, 396 S.E.2d 860, 862 (1990). "Complete certainty as to an utterance's true meaning can be ascertained only by considering every word in it." *Pierce v. Commonwealth*, 2 Va. App. 383, 388, 345 S.E.2d 1, 4 (1986). "The change, omission, or addition of even a single word may radically alter the meaning." *Id.*

Pugliese was given the choice of providing the jury with a written transcript or the tape. Had he chosen the transcript, deletion of the references would have been feasible. *See id.* at 391, 345 S.E.2d at 5 (inadmissible statements could have been removed from written transcript without adverse effect on entire statement). Pugliese elected to have the recorded conversation presented. The trial court did not commit reversible error by refusing to redact from Pugliese's recorded statement his comment that he was willing to take a lie detector test.

## III. RECORDED CONFESSION TO JURY

■ Code § 8.01-381 provides that upon the request of any party, the court shall instruct the jury that they may request exhibits for use during deliberations. Exhibits requested by the jury shall be sent to the jury room or otherwise be made available. Code § 8.01-381. An out-of-court statement, whether written or recorded, which is introduced into evidence, is an "exhibit." Therefore, the jury was entitled to take Pugliese's recorded statement, which was introduced into evidence as an exhibit, into the jury room.

We reject Pugliese's claim that permitting the jury to have a recorded statement by the accused in the jury room is prejudicial error because it creates a danger that, by replaying it, that part of the evidence will be overemphasized. This "risk" exists when a jury peruses any exhibit. The legislature has determined that the jury is entitled to have exhibits in the jury room. Nothing in the Virginia statutes or case law requires the trial judge to supervise the jury's review of evidence to "prevent overemphasis." The fact that a jury may dwell upon or emphasize any evidence, whether testimony or exhibits, is within the jury's purview in weighing and considering the evidence. Therefore, the

trial court did not err by allowing the jury to have the exhibits, which included Pugliese's recorded statement, in the jury room during deliberations without court supervision.

## IV. OTHER CRIMES EVIDENCE

 Evidence of other crimes is not admissible to show a defendant's propensity to commit a crime. *Kirkpatrick v. Commonwealth*, 211 Va. 269, 272, 176 S.E.2d 802, 805 (1970); *Sutphin v. Commonwealth*, 1 Va. App. 241, 245, 337 S.E.2d 897, 899 (1985). On the other hand, such evidence is admissible when it is "relevant to an issue or element in the present case." *Sutphin*, 1 Va. App. at 245, 337 S.E.2d at 899; *see also Kirkpatrick*, 211 Va. at 272, 176 S.E.2d at 805. Furthermore, "if such evidence tends to prove any other relevant fact of the offense charged, and is otherwise admissible, it will not be excluded merely because it also shows [the defendant] to have been guilty of another crime." *Williams v. Commonwealth*, 203 Va. 837, 841, 127 S.E.2d 423, 426 (1962); *Day v. Commonwealth*, 196 Va. 907, 914, 86 S.E.2d 23, 26-27 (1955). Evidence of other crimes may be admissible to prove motive, intent, agency, or knowledge; or to prove that the charged crime is part of a general scheme; or to prove or explain how the crime was accomplished. *Freeman v. Commonwealth*, 223 Va. 301, 313-14, 288 S.E.2d 461, 467-68 (1982); *Evans v. Commonwealth*, 222 Va. 766, 773-74, 284 S.E.2d 816, 820 (1981), *cert. denied*, 455 U.S. 1038 (1982).

The trial judge did not err by permitting Brenda Hall to testify that Pugliese purchased cocaine from her after the robbery and murder of Beckmann. The evidence of Pugliese spending the money taken from Beckmann and what it was spent to purchase was relevant to prove that Pugliese participated in the crimes and to prove that he had a motive for committing the crimes. Furthermore, Pugliese confessed to using the proceeds from the robbery to purchase cocaine, and he did not expressly object to that portion of his statement. The probative value of Brenda Hall's testimony to prove motive and to prove that Pugliese was a criminal agent outweighed the prejudicial effect of such evidence. *See Lewis v. Commonwealth*, 225 Va. 497, 502, 303 S.E.2d 890, 893 (1983).

## V. SUFFICIENCY OF THE EVIDENCE - ROBBERY AND MURDER

When sufficiency of the evidence is at issue on appeal, the evidence must be viewed in the light most favorable to the Commonwealth, and the evidence must be accorded all reasonable inferences fairly deducible therefrom. *Higginbotham v. Commonwealth*, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975). A jury's verdict will not be disturbed unless it was plainly wrong or without evidence to support it. Code § 8.01-680; *Stockton v. Commonwealth*, 227 Va. 124, 145-46, 314 S.E.2d 371, 385, *cert. denied*, 469 U.S. 873 (1984); *Albert v. Commonwealth*, 2 Va. App. 734, 741-42, 347 S.E.2d 534, 538-39 (1986).

When weighing the evidence, the fact finder is not required to accept entirely either the Commonwealth's or the defendant's account of the facts. *Barrett v. Commonwealth*, 231 Va. 102, 107, 341 S.E.2d 190, 193 (1986). Similarly, the fact finder is not required to believe all aspects of a defendant's statement or testimony; the judge or jury may reject that which it finds implausible, but accept other parts which it finds to be believable. *Durham v. Commonwealth*, 214 Va. 166, 169, 198 S.E.2d 603, 606 (1973). Thus, the jury was entitled to accept only those parts of Pugliese's version of how the robbery and murder occurred which they found to be plausible and credible.

A conviction for robbery requires proof beyond a reasonable doubt that the defendant alone, or acting in concert with others, took property from the victim by force, threats, or violence, and that the intent to steal co-existed with the act of force. *Pierce v. Commonwealth*, 205 Va. 528, 532, 138 S.E.2d 28, 31 (1964). To prove that Pugliese was a principal in the second degree to murder, the Commonwealth had to prove beyond a reasonable doubt that he was present during the offense and aided, abetted or encouraged the killer in his crime. *Rollston v. Commonwealth*, 11 Va. App. 535, 539, 399 S.E.2d 823, 825 (1991); *Augustine v. Commonwealth*, 226 Va. 120, 124, 306 S.E.2d 886, 888-89 (1983). Furthermore, the defendant must have shared the criminal intent of the principal in the first degree. *Triplett v. Commonwealth*, 141 Va. 577, 586, 127 S.E. 486, 489 (1925); *Rollston*, 11 Va. App. at 539, 399 S.E.2d at 825.

Pugliese contends that he had no intention of robbing or killing Beckmann and that Davis, as the sole perpetrator, unexpectedly committed both crimes. He asserts that he was merely present when Davis

committed the crimes and that the evidence was insufficient to prove that he acted in concert with Davis to rob Beckmann or that he aided or abetted in any way Beckmann's murder. We find the evidence sufficient to support the jury's findings and to prove beyond a reasonable doubt that Pugliese participated in robbing Beckmann and aided and abetted Davis in murdering Beckmann.

■ In Virginia, a perpetrator and principal in the second degree are equally liable for the crimes of robbery and first degree murder. Code § 18.2-18.

> A principal in the second degree is one not the perpetrator, but present, aiding and abetting the act done, or keeping watch or guard at some convenient distance. . . . Every person who is present at the commission of a [crime], encouraging or inciting the same by words, gestures, looks, or signs, or who in any way, or by any means, countenances or approves the same is, in law, assumed to be an aider and abettor, and is liable as principal.

*Foster v. Commonwealth*, 179 Va. 96, 99, 18 S.E.2d 314, 315-16 (1942). The fact finder did not have to accept Pugliese's statement that he did not participate in the robbery or murder when the circumstantial and direct evidence indicated otherwise and showed that immediately after Davis killed Beckmann, Pugliese knowingly and willingly aided in fleeing the scene, destroying evidence, avoiding detection, and receiving a share of the fruits of the crimes. *See Durham*, 214 Va. at 169, 198 S.E.2d at 606.

> Mere presence when a crime is committed is, of course, not sufficient to render one guilty as aider or abettor. There must be something to show that the person present and so charged, in some way procured, or incited, or encouraged, the act done by the actual perpetrator. But whether a person does in fact aid or abet another in the commission of a crime is a question which may be determined by circumstances as well as by direct evidence. . . .
>
> To constitute one an aider and abettor, he must be guilty of some overt act, or he must share the criminal intent of the principal or party who commits the crime. . . .
>
> Notwithstanding these rules as to the nonliability of a passive spectator, it is certain that proof that a person is present at the commission of a crime without disapproving or opposing it, is

evidence from which, in connection with other circumstances, it is competent for the jury to infer that he assented thereto, lent to it his countenance and approval, and was thereby aiding and abet- . ting the same.

*Foster*, 179 Va. at 99-100, 18 S.E.2d at 316 (citations omitted).

Although Pugliese's account of how Davis robbed and murdered Beckmann seeks to absolve Ebert and himself of any complicity in the robbery/murder, the facts and circumstances leading up to and after the crimes were sufficient to prove Pugliese's participation. The circumstances were such that the jury could reasonably have concluded that Pugliese participated in the robbery and aided and abetted Davis in the murder. Davis told Pugliese before the robbery/murder that he intended to "hustle" Beckmann out of his money. Although Pugliese knew of Davis' criminal intent to take Beckmann's property, he did nothing to discourage Davis or to report him to the authorities. Instead, he accompanied Davis, knowing that Davis intended to commit a crime. While mere presence at the scene of a crime or knowledge that a crime is going to be committed does not constitute aiding and abetting, accompanying a person with full knowledge that the person intends to commit a crime and doing nothing to discourage it bolsters the perpetrator's resolve, lends countenance to the perpetrator's criminal intentions, and thereby aids and abets the actual perpetrator in the commission of the crime.

After Beckmann was shot, Pugliese and the others took more than twelve hundred dollars from Beckmann's van; Pugliese personally drove the van to a location where he and the others removed Beckmann's valuables, of which he received a share; and Pugliese personally helped "torch" the van. *See Elmoe v. Commonwealth*, 132 Va. 529, 538-39, 110 S.E. 257, 260 (1922). Pugliese used his share of the money from the robbery/murder to purchase drugs. Pugliese did nothing to prevent Davis from robbing or murdering Beckmann; he did not report the robbery/murder after it occurred; and when questioned about the crimes, he falsified having any knowledge about them. *See Speight v. Commonwealth*, 4 Va. App. 83, 89, 354 S.E.2d 95, 99 (1987) (en banc). When viewed in the light most favorable to the Commonwealth, and granting to it all reasonable inferences, the jury reasonably could have concluded from the facts that Pugliese knew beforehand of Davis' criminal intent and, because he assisted in disposing of the van and received part of the proceeds of the robbery/

murder, that he shared Davis' criminal intention. Accordingly, the evidence is sufficient to support Pugliese's convictions for robbery and for murder as a principal in the second degree.

## VI. JURY INSTRUCTION ON DURESS

When credible evidence tending to support the existence of a particular defense is introduced, it is reversible error not to instruct the jury on that defense. *McClung v. Commonwealth*, 215 Va. 654, 657, 212 S.E.2d 290, 293 (1975); *Taylor v. Commonwealth*, 186 Va. 587, 591, 43 S.E.2d 906, 908 (1947). The evidence, when viewed most favorably to Pugliese, did not tend to prove that Davis forced him to participate in robbing or murdering Beckmann. At best, Pugliese showed that Davis threatened Ebert after Beckmann's murder in order to force Ebert to assist him in disposing of Beckmann's body, van, and property. Pugliese testified that he feared for his life because of Davis' threats to Ebert. However, no evidence was presented that Davis made or directed any threats to Pugliese. Thus, the evidence was not sufficient to support giving a duress instruction that would excuse Pugliese for his participation in the crimes. The trial judge did not err in refusing to instruct the jury on duress.

Furthermore, duress is a narrow defense that generally is not available to a charge of murder. Wayne R. LaFave & Austin W. Scott, Jr., *Handbook on Criminal Law* § 49, at 375-76 (1972). The rationale underlying a claim of duress is that, for reasons of social policy, it is better that a person, faced with a choice of evils, choose to do the lesser evil, that is, to violate the criminal law, in order to avoid the greater threatened evil of death or serious injury. *Sam v. Commonwealth*, 13 Va. App. 312, 323, 411 S.E.2d 832, 838 (1991) (quoting 1 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* 614 (1986)). It is this balancing of harms that generally precludes the use of duress as a defense to murder. Roger D. Groot, *Criminal Offenses and Defenses in Virginia* 118 n.4 (2d ed. 1989).

An exception to the rule that duress is not available as a defense to murder is in felony murder cases, where one confederate is held responsible for a killing committed by his co-actor during the commission of the underlying felony. If the defendant participated in the underlying felony under threat of death or serious harm by his co-actor, and the co-actor kills another in the commission of the felony, duress excuses the defendant's participation in the underlying felony

and thereby excuses the defendant for the unintended killing committed by his co-actor. Wayne R. LaFave & Austin W. Scott, Jr., *Handbook on Criminal Law* § 49, at 376-77 (1972); *see also Sam*, 13 Va. App. at 324, 411 S.E.2d at 838.

In Pugliese's case, however, he does not claim that Davis forced him to participate in robbing Beckmann, during which Davis unexpectedly murdered Beckmann. His only claim of duress is that Davis threatened Ebert in order to force him to assist, after the fact, in disposing of the body, the van, and Beckmann's valuables and that he, too, felt threatened to participate. Thus, Pugliese also was not entitled to a duress instruction under a felony murder theory where Pugliese knew that Davis intended to "hustle" Beckmann and he voluntarily accompanied Davis and did nothing to discourage or prevent the crime from being committed.

## VII. INCONSISTENT VERDICTS

We reject Pugliese's contention that the verdict of robbery as a principal in the first degree is inconsistent with the verdict of murder as a principal in the second degree. The fact that verdicts may, on their face, arguably appear inconsistent does not provide a basis to reverse either conviction on appeal, provided the evidence is sufficient to support each verdict. *United States v. Powell*, 469 U.S. 57, 66 (1984); *Dunn v. United States*, 284 U.S. 390, 393 (1932); *Wolfe v. Commonwealth*, 6 Va. App. 640, 648, 371 S.E.2d 314, 318 (1988). Jury verdicts may appear inconsistent because the jury has elected through mistake, compromise, or lenity to acquit or to convict of a lesser offense for one charged crime that seems in conflict with the verdict for another charged offense. *Powell*, 469 U.S. at 65; *Wolfe*, 6 Va. App. at 649-50, 371 S.E.2d at 319. Both verdicts will be upheld, despite the apparent inconsistency, provided the evidence supports each verdict. Here, the verdicts finding Pugliese guilty of robbery and guilty of murder as a principal in the second degree are not in conflict. Pugliese, after receiving knowledge that Davis intended to "hustle" Beckmann, proceeded with Davis and Beckmann in the van, disposed of the van, and actively received and used a share of the fruits of the robbery. However, as to the murder, the jury could reasonably have found, as they apparently did, that Davis was the perpetrator and that Pugliese knowingly aided and abetted in the murder—which rendered

him culpable as a principal in the second degree. Accordingly, we affirm the jury's verdicts and the convictions.

*Affirmed.*

Baker, J., and Fitzpatrick, J., concurred.